**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Charles Olivier Peyre, | No. CV-23-00350-PHX-DWL |
| Petitioner, | **ORDER** |
| v. | |
| Catharine Bliss McGarey, | |
| Respondent. | |

## INTRODUCTION

The parties in this action are Charles Olivier Peyré ("Father"), who is a French citizen, and Catharine Bliss McGarey ("Mother"), who is an American citizen. Father and Mother met each other in 2017 when living in Ireland, then moved to France. While living in France, Father and Mother got married and had twins ("the Children").

On June 30, 2022, Mother flew to the United States with the Children while Father remained in France. Much of the dispute in this case turns on the nature of that trip—Mother contends it was part of an agreed-to plan for her to permanently relocate to the United States with the Children as she and Father were considering whether to divorce, while Father contends it was simply a summer vacation from which Mother and the Children were expected to return. (*See generally* Doc. 23.)[1]

---

[1]     The abbreviation "Doc." refers to where the cited document was filed as part of the docket. The abbreviation "Ex." refers to the exhibit number during the evidentiary hearing. The abbreviation "Tr." refers to the page number of the hearing transcript, which appears at Docs. 38-44.

In November 2022, Father filed a police report with French authorities accusing Mother of wrongfully removing the Children from France.  (Ex. 5, Bates 170-73.)  The following month, in December 2022, Father filed formal requests for assistance with the French Ministry of Justice (Ex. 15) and the U.S. Central Authority (Ex. 16, Bates 324). Finally, on February 27, 2023, Father initiated this action by filing a verified petition under the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*, which implements the provisions of the Hague Convention on the Civil Aspects of International Child Abduction.  (Doc. 1.)[2]  As relief, Father seeks an order "establishing that the Children shall be returned to France, where an appropriate custody determination can [be] made by a French court under French law."  (*Id.* at 7.)  Mother's primary defenses are that "Father consented and/or acquiesced to removal or retention of the Children from France to Arizona" and that "the return of the Children would expose them to a grave risk of harm based on Father's domestic violence against Mother and serious abuse or neglect against the Children."  (Doc. 15 at 5-6.)

Over the course of five trial days between May 1-12, 2023, the Court held an evidentiary hearing.  As explained below, although this is a close and difficult case, the Court concludes that Father is entitled to relief under ICARA.  Thus, Mother will be required to return the Children to France.

## FINDINGS OF FACT

I.   <u>Background Details</u>

Mother is a citizen of the United States.  (Doc. 23 at 1.)  Mother was born and raised in Arizona and moved to Ireland in December 2016.  (*Id.*)  While living in Ireland, Mother met Father, who is a French citizen.  (*Id.*)  Mother and Father later moved to France to live together.  (*Id.*)

In July 2019, Mother and Father were married in France.  (*Id.* at 2.)  In 2021, the Children were born in France.  (*Id.* at 6, 8.)

---

[2]     *See generally In re ICJ*, 13 F.4th 753, 760 (9th Cir. 2021) ("The United States ratified the Hague Convention in 1988, and Congress implemented the Convention through the International Child Abduction Remedies Act ('ICARA').").

Mother and Father jointly owned, along with their parents, a bar in France called the Garage Bar.  The Garage Bar is relevant because, as discussed in more detail below, the parties' plan to relocate to the United States was, at least at times, contingent on the sale of the Garage Bar.

On November 30, 2021, Father applied for a visa to work in the United States.  (Ex. 39.)

On May 24, 2022, Mother bought one-way tickets for herself, her sister, and the Children to travel to the United States on June 30, 2022.  (Ex. 40.)

On June 30, 2022, Mother and the Children took the flight as planned.  They have not since returned to France.

II.    Pre-Departure Statements Concerning The Plan To Move To The United States

Ascertaining the nature of Mother's trip to the United States on June 30, 2022 is complicated because, although the parties repeatedly expressed plans to relocate to the United States, the details of the plan shifted over time.  It is therefore helpful to provide a chronological account of the parties' description of the plan in the months, weeks, and days leading up to Mother's departure with the Children.

In forming this chronology, the Court has largely focused on the plans and intentions that the parties expressed in writing.  During the evidentiary hearing, both parties also sought to offer testimony and evidence about various purported oral admissions the other party made.  The Court found that testimony and evidence less helpful than the written evidence, due to the lack of corroboration.[3]

---

[3]    For example, one of Father's friends wrote in a declaration that Mother admitted to him during a conversation right before the June 30, 2022 flight "that she was home-sick (the USA)" and "never said that she wanted to stay and live in the USA" and "always stated that she was going for the summer break."  (Ex. 21, Bates 354.)  Meanwhile, Mother's father contends that Father admitted to him, during a vacation in London in April 2022, that Father knew Mother would be "moving to Phoenix with the kids" and confirmed that Father "would be OK to remain in France during the time it took to sell the bar . . . . [Father] compared this arrangement to a military family with a dad out on tour."  (Ex. 50, Bates 151.)  To be clear, the Court does not question to honesty of the witnesses who provided these (and similar) statements.  However, it is difficult to make credibility judgments when presented with conflicting, uncorroborated statements by fact witnesses who are, understandably, sympathetic to their friend's or family member's legal position.

A.      **Father's November 21, 2021 Email**

With these clarifications in mind, the first relevant statement was made on November 12, 2021, when Father wrote an email to Mother's parents that included the following passage: "I don't know if Katie already told you that we are looking forward to settle in Phoenix soon.  We are talking about making it happen for June [20]22.  You can guess we will have a lot to discuss during that time!"  (Ex. 31.)

From the Court's perspective in its capacity as factfinder, this email does not assist either side's case.  Although the projected arrival date of June 2022 might seem, at first blush, to be helpful to Mother's position (because that is when she ultimately traveled to the United States with the Children), the email does not provide details about the planned move and does not suggest that Mother and the Children would be leaving Father behind in France.  Thus, although the email confirms that, as of the fall of 2021, Mother and Father had a general plan to relocate to the United States in June 2022, it sheds little light on what they were thinking (and had agreed to) when Mother actually left on June 30, 2022.[4]

B.      **January 5, 2022 Counseling Session**

The next relevant statements occurred on January 5, 2022.  For context, during a trip to Arizona over the 2021 holiday season to visit Mother's family, Mother and Father decided to meet with a couples' counselor named Michelle Shahbazyan ("Shahbazyan").  During the evidentiary hearing, Shahbazyan testified about the topics that were discussed during that counseling session.[5]

More specifically, Shahbazyan testified that although Mother and Father jointly agreed, during the counseling session, to a plan to eventually relocate to the United States, that plan was contingent on certain developments occurring first, including Father selling

---

[4]      For similar reasons, the Court assigns little weight to the affidavit of realtor Matt Cerchiai, who contends that, during a house-hunting session in late December 2021, "Katie and Charles told me they would get back in touch with me when they arrived in Arizona in approximately July of 2022, to begin permanently residing in Arizona."  (Ex. 53 ¶¶ 4, 6.)  Although both parties intended, as of December 2021, to jointly move to the United States in the summer of 2022, that plan later changed.

[5]      Shahbazyan also attempted to summarize the discussion in a letter, which was generally consistent with her testimony.  (Doc. 48.)

an apartment he owned in France[6] and Father and Mother selling the Garage Bar, which would only make financial sense after the bar became more profitable.   Critically, Shahbazyan made clear that the plan discussed (and jointly agreed to) during the counseling session did *not* involve Mother and the Children moving to the United States without Father:

> From my perspective it seemed that they wanted to do everything to keep the four of them in the same space as much as possible.  Like it wasn't like, oh, Katie was just going to come here with the kids and just wait and see until he figured things out.  It was very much . . . we want to do this together and how do we figure this out together and let's keep the kids . . . near both parents as much as possible and go step by step so that that can happen.

(Tr. 203-04.)   Shahbazyan also testified that it was her impression that the relocation process could take as long as "maybe a year" to complete after Mother and Father returned to France, because that was how long it might take to sell the apartment and the Garage Bar.  (Tr. 205.)  Finally, Shahbazyan clarified that she did "not have the understanding that [Mother] was just going to show up in the U.S. like regardless at the one year mark or something."  (Tr. 215.)

From the Court's perspective in its capacity as factfinder, Shahbazyan's testimony was more helpful to Father than to Mother.  Shahbazyan's testimony establishes that, as of January 2022, the parties' plan was to return to France, sell Father's apartment, increase the profitability of the Garage Bar, sell the Garage Bar, and then (and only then) relocate to the United States as a family.  At that time, there was no suggestion, let alone an agreement, that Mother and the Children would move to the United States without Father, and both sides agreed that it might take a year before all of the necessary steps were completed—a timeframe that, as discussed in more detail below, is consistent with some of the parties' subsequent statements and conduct.

…

…

---

[6]    Father eventually sold the apartment in March 2022.  (Ex. 35, Bates 15.)

### C.   Mother's May 27, 2022 Statement

As noted, on May 24, 2022, Mother bought one-way tickets for herself, her sister, and the Children to travel to the United States on June 30, 2022.  (Ex. 40.)  Three days later, on May 27, 2022, Mother and Father got into a disagreement about that trip.

Although this conversation was oral, Mother later recounted the substance of the conversation to the French police following a separate disagreement with Father on June 20, 2022.  She described the earlier disagreement as follows: "[On] Friday May 27 2022, we had . . . we were at home and *I asked him on which date he wanted to come to the USA, to check about our return to France*, I can't travel by myself with the two kids as they're under two years old . . . .  I asked him several times and he wasn't precise, I felt like he didn't want to come."  (Ex. 5, Bates 146, emphasis added.)

From the Court's perspective in its capacity as factfinder, this statement is helpful to Father's position.  It shows that, as of May 27, 2022, Mother's upcoming trip to the United States was not viewed by either party as a permanent move with the Children—instead, it was a visit from which Mother and the Children would be returning.  Of course, this statement is not dispositive, because there were an array of subsequent developments, but it helps frame the issues—Mother must establish that something changed after May 27, 2022 concerning Father's understanding of, and consent to, the nature of her June 30, 2022 trip.

### D.   Father's May 27, 2022 Email

That same day, Father wrote an email to his parents, Mother's parents, and Mother entitled "Family life and company."  (Ex. 32.)

At the outset of this email, Father apologized for not writing in his "mother tongue," announced that Mother had asked him for a divorce, and also announced that Mother had made a "threat[]" to "not renew her visa in January [2023] and leave France with the kids. I can understand that she is home sick and want[s] to be close to her family, though it [is] still hard to accept."  (*Id.*)

The remainder of the email provided as follows:

The reason why I cannot follow her in January is that we cannot sell the bar so far like she asked me to.  The point is that we received the annual balance sheet and right now the garage bar [is] worth 215 000€ . . . .  The plan to get back on our feet will last two more years and we can expect selling the garage for a good and decent price after May [20]24.  I can explain to you the details of the plan another time if you want to.

By the time that we sell our business, our problems of separation we [sic] still there.  After few adult discussions without yelling at each other we have talked about arrangements that could "please" everyone:

- she leaves first with the kids and I come as much as I can to visit

- buy her parts of the bar so she got [sic] the money she needs to settle correctly in the US

- you will be in charge financially for the baby day care and help Katie daily with the kids until I get back a year and a half after she left

The other option is that we divorce and it's the end of the adventure for us and the kids will grow without there [sic] dad.  In that case I hope that I will receive[] my visa one day to move near by when possible so I can see [the Children] when the judge will let me see them I guess.

I hope that with this mail everybody will fully understand what is happening right now.  I wish that we will all find an adult and clever solution that will suit[] everyone.

(*Id.*)

From the Court's perspective in its capacity as factfinder, this email it is not the smoking gun that Mother sometimes portrayed it to be.  To be sure, the email shows that Father's understanding of the relocation plan had changed since the January 2022 counseling session with Shahbazyan—the plan was no longer that the Garage Bar would be sold in the fall of 2022 and the entire family would move to the United States afterward.  Additionally, the email reflects Father's awareness of some potential scenarios where Mother and the Children would be moving to the United States without him.  But such awareness is not the same thing as affirmative consent for Mother to move permanently with the Children to the United States in June 2022, and several features of this email are inconsistent with the notion that Father had consented to such a move.

First, the email discusses Father's "reason why I cannot follow her in January."  This

allusion to January is potentially significant because it is consistent with the position that Father has taken in this litigation (and that is expressed in some of the parties' other written communications), which is that the June 2022 trip was not a permanent move but simply a summer vacation from which Mother and the Children would be returning, with the possibility of a later, permanent move in or around January 2023.  If that was Father's expectation, he did not consent to a permanent move in June 2022.

Second, in the middle portion of the email discussing the possible scenario in which Mother would "leave[] first with the kids," Father suggested that one component of that scenario would be for him to buy out Mother's ownership interest in the Garage Bar ("buy her parts of the bar so she got [sic] the money she needs to settle correctly in the US"). However, the evidence presented during the evidentiary hearing suggests that no such buyout ever occurred.  It is therefore difficult to view the May 27, 2022 email as proof that Father understood Mother's June 30, 2022 trip to be a permanent relocation and consented to it.

Third, the penultimate paragraph of the email—which begins with "The other option"—makes clear that Father was not affirmatively consenting to the scenario in which Mother would move to the United States with the Children with his permission but was simply identifying it as one potential outcome.  The "other option" identified in this paragraph was that Mother and Father would divorce, at which point Mother and Children would relocate to the United States.  However, the paragraph does not clarify whether, in the divorce scenario, Father would consent to such a relocation or whether he simply believed the French courts would inevitably allow Mother to relocate to the United States with the Children.  During the evidentiary hearing, Father credibly explained that this phrasing was not intended to signal his consent to such an outcome and merely reflected his pessimistic belief that a French judge would likely favor the mother in any custody dispute.  In any event, under either interpretation, the "other option" described in this paragraph is inconsistent with the notion that Father understood Mother's June 30, 2022 trip to be a permanent relocation and consented to it, as neither party had filed for divorce

at the time of the trip.

E. **The Parties' May 27, 2022 Text Exchange**

At 10:21 am on May 27, 2022, Father sent the following text message to Mother: "I'm calling a lawyer on Monday to start the divorce proceedings." (Ex. 35, Bates 16.) Mother responded: "What was the whole point of your email saying we have multiple options if you're just going to text me about a divorce hours later?" (*Id.*)

From the Court's perspective in its capacity as factfinder, this text exchange helps confirm the interpretation of the May 27, 2022 email set forth in Part II.D above. Specifically, it reflects that even Mother didn't view the first scenario discussed in the email (*i.e.*, Mother moving with the Children to the United States while Father stays behind) as a course of action to which the parties had *agreed*. Instead, this was simply one of "multiple options." Additionally, this text exchange suggests that, after Father sent the email, he decided that he wished to obtain a divorce. This was the other option discussed in the email.

F. **Madame Carmouse's May 29, 2022 Letter**

Another piece of evidence that was the subject of extensive discussion during the evidentiary hearing was an undated letter written by Catherine Carmouse ("Madame Carmouse"), a French attorney. (Ex. 33.)

As background, Father's mother, Annie Claude Peyré ("Annie Claude"), reached out to Madame Carmouse for legal advice after receiving Father's May 27, 2022 email. Annie Claude testified that she simply forwarded Father's email to Madame Carmouse, without providing any other information about Father's situation, and Madame Carmouse responded on May 29, 2022 with the letter. Annie Claude then provided a copy of Madame Carmouse's letter to Father, which Mother happened to find on May 30, 2022, leading to a disagreement.

As for the letter itself, Madame Carmouse provided such advice as "Charles must be careful . . . [and] must not write to Katie any more making or proposing commitments"; "Charles must make a decision. Divorce, or no divorce"; "If Charles decides to divorce he

must do so quickly while the family is in France"; "If she leaves with the children for the USA she will be able to initiate proceedings there and American judges rarely become involved with questions of international competence and the applicable law"; and "even if Charles is very kind, what he does or writes could have consequences for his future life.  I recall that not long ago Katie was crying in my colleague's office because she no longer had a visa . . . and today she is going away with two children in her arms and it is Charles who will pay those consequences."  (Ex. 33.)  Additionally, Madame Carmouse advised, with respect to the parties' ownership interests in the Garage Bar, that "for Charles, it will be better to buy back, without delay, at least Katie's shares, particularly if the results from the valuation are not very good.  To avoid suspicion it is possible to instruct an expert responsible for the valuation of the shares and if they are worth nothing (according to the accounting method) and he wishes even so to contribute something that is his choice, well and good."  (*Id.*)

From the Court's perspective in its capacity as factfinder, Madame Carmouse's letter has little evidentiary value.  Again, the critical question is whether Father understood Mother's June 30, 2022 trip to be a permanent relocation and consented to it.  The statements in Madame Carmouse's letter shed little light on that question because she apparently never spoke to Father—instead, she simply reviewed his May 27, 2022 email and then wrote a letter to Annie Claude.

At most, Madame Carmouse's letter imparted notice to Father (after it was forwarded to him) that it was legally risky for him to allow Mother to leave France with the Children before they divorced, because Mother might then be able to initiate custody proceedings in an American court.  But being aware that a particular course of action has some risk of an undesired outcome is not the same thing as affirmatively consenting to that undesired outcome.[7]

---

[7]      During the evidentiary hearing, Mother credibly testified that her discovery of Madame Carmouse's letter was very upsetting, in part because she perceived it as an attempt by her mother-in-law to concoct a scheme to cheat her out of the fair value of her ownership interest in the Garage Bar.  The Court does not question the sincerity of Mother's testimony on this point, but that aspect of the letter is distinct from the letter's bearing on whether Father understood the June 30, 2022 trip to be a permanent move and consented

G.      **Mother's May 31, 2022 Text Message**

On May 31, 2022—one day after discovering Madame Carmouse's letter and getting into a disagreement with Father about it—Mother wrote a series of text messages to Aubrey Richardson ("Richardson"), a close friend.  (Ex. 34, Bates 9.)  In relevant part, they provided: "Hey girl.  I wanted to let you know that Charles asked for a divorce[.]  I've been wanting to move home, so homesick and hurting without being close to my family.  And Charles said he was good with that plan for a while but things have been really bad between us[.]  And he wants to keep the bar, I don't.  So looks like I'll be moving to Arizona with the babies.  He wants to give me custody, with visiting rights.  But now I need a lawyer so let me know if you have any contacts[.]"  (*Id.*)  Later, Mother added: "I told him I don't want to renew my titre de séjour (expires January) and that I want to go ahead to Arizona then to set up life and he wraps up the sale of the bar.  He then said he wants to stay 'at least' two more years here for the bar."  (*Id.*, Bates 10.)

From the Court's perspective in its capacity as factfinder, these text messages are too ambiguous to provide much support for either side's position.  On the one hand, they suggest that Father had agreed that Mother and the Children could move permanently to the United States without him.  On the other hand, although the first series of text messages suggested that Mother would be "moving to Arizona with the babies," they did not give a date for the move and also suggested that Father's expectation was that lawyers would be involved to formalize Father's visitation rights.  (*Id.*, Bates 9.)  This is not consistent with Mother permanently moving to the United States less than a month later in June 2022, before any lawyers were involved.  In a related vein, during the second series of text messages, Mother identified January 2023 as the date when her French work authorization would expire and then immediately stated: "I want to go ahead to Arizona *then* to set up life."  (*Id.*, Bates 10, emphasis added.)  This timeframe—which was also mentioned in several of the parties' other communications bearing on the issue of consent—is consistent with the notion that the June 2022 trip was simply a vacation from which Mother and the

_____

to it.

1    Children would be returning, not a permanent move.

2         **H.**      **The Parties' June 2, 2022 Text Exchange**

3         On June 2, 2022, Father texted Mother to ask how the Children were doing.  (Ex.

4    35, Bates 16.)  In response, Mother reported that the Children were "really emotional" and

5    added: "They are picking up on all of this.  This is why I can't come back after summer

6    vacation.  It's not fair for the kids or myself to live in this misery." (*Id.*)  Father eventually

7    wrote back: "I am very sad to hear that the children are unhappy and are having a hard time

8    with it.  I wish it had gone differently.  You know that I love them more than anything and

9    that the only thing that matters to me is that they are happy." (*Id.*, Bates 17.)

10         From the Court's perspective in its capacity as factfinder, these text messages are

11    too ambiguous, standing alone, to support either side's position on the issue of consent.

12    On the one hand, Mother's statement that "[t]his is why I can't come back after summer

13    vacation" is evidence that she was considering staying in the United States at the

14    conclusion of the trip (and Father was aware of that possibility).  On the other hand,

15    Father's knowledge that Mother was *threatening* to remain in the United States is not the

16    same thing as Father's *consent* to that course of action.  Additionally, Mother's description

17    of the trip as "summer vacation" supports how Father has consistently described it.

18         Mother's use of this phrase is also relevant for another, perhaps more important

19    reason.  When testifying during the evidentiary hearing, Mother flatly denied ever

20    characterizing the June 30, 2022 trip as a "vacation" and seemed to suggest that Father was

21    making up this description in an attempt to bolster his litigation position:

22         Q.      In any of your prior discussion with Charles, had there ever been a
23                 return date set for you when you left with the children—

24         A.      Never.

             Q.      —on June 30?
25         A.      Never.

26         Q.      *Had there ever been a discussion of this was just a vacation?*
27         A.      *No.*

28    (Tr. 544-45, emphasis added.)  Similarly, when asked "Did he ever put a return date on it

or say it was only a vacation," Mother answered: "Not once.  Not ever."  (Tr. 566.)  The June 2, 2022 text exchange undermines Mother's testimony on this point because it shows that she did, in fact, sometimes refer to the trip as a vacation.

I. **Mother's June 19, 2022 Text Message**

On June 19, 2022, Mother sent another series of text messages to Richardson.  In relevant part, they provided: "Things are really good with Charles.  He's talking about settling the bar after we do a pre bilan [accounting] In October.  And Is ok for me to move to Arizona before Xmas so we can be there for the holidays and then the kids start their daycare program January.  Everything is calm and good." (Ex. 34, Bates 12.)

From the Court's perspective in its capacity as factfinder, these text messages are one of Father's strongest pieces of evidence on the issue of consent.  They suggest that Mother and the Children would not be moving permanently to the United States until the very end of 2022, "before Xmas so we can be there for the holidays."  (*Id.*)  This is consistent with the timeframe expressed in many of the other parties' communications bearing on the issue of consent and is consistent with Father's position that the June 2022 trip was simply a vacation from which Mother and the Children would return.  In contrast, it is very difficult to reconcile these text messages with the notion that Mother and the Children were leaving France for good in June 2022, never to return.

J. **The Parties' June 20-21, 2022 Statements To The Police**

On the evening of June 20, 2022, the parties got into a physical altercation that led to a neighbor calling the police.  Father was held in jail overnight and eventually charged with a domestic violence offense (of which he was later acquitted).

As relevant here, both parties made statements to the police (outside each other's presence) regarding Mother's travel plans.  Mother stated: "[O]n June 30, 2022 I was supposed to go to the United States for 02 months." (Ex. 5, Bates 144.)  Meanwhile, when asked "How do you envisage your relationship today?", Father stated: "We will go through divorce proceedings.  She will go to the USA and I will stay in France.  The children will follow their mother to the USA, I accept it." (Ex. 37, Bates 90.)

From the Court's perspective in its capacity as factfinder, these statements are favorable to Father on the issue of consent.  Most important, Mother acknowledged that she expected to return to France about two months after the trip on June 30, 2022.  This is inconsistent with the notion that the trip was a permanent, one-way move (let alone that Father was aware it would be a permanent, one-way move and consented to it) and consistent with notion that any permanent move would occur later, perhaps around Christmas 2022.  Meanwhile, although Father acknowledged the possibility that Mother would eventually move to the United States with the Children, he also stated that "We will go through divorce proceedings."  Although Father may have expressed pessimism about his chances of prevailing on the issue of child custody in that future proceeding, such pessimism is not the same thing as consent for Mother to take the Children to the United States before the future proceeding had even begun.

### K.    Mother's June 22, 2022 Text Messages

On June 22, 2022, Mother sent another series of text messages to Richardson.  In relevant part, they provided: "I didn't want to tell you over text but things are not good again[.]  I think we will be leaving France indefinitely June 30[.]  I may need you to take some of my antique stuff . . . [u]ntil I can figure out a good way to get them back or you keep them."  (Ex. 34, Bates 13.)

That same day, Mother sent a series of text messages to a friend named Val Lodge, to whom she was attempting to sell some of the Children's furniture.  In relevant part, the text messages provided: "I'm actually moving back to the USA which is why I'm selling my things. . . .  [I]ts [sic] a little complicated right now with my husband (French) and I'll be moving back with my kids June 30 and not sure he'll be joining us."  (Ex. 42, Bates 112.)

From the Court's perspective in its capacity as factfinder, these text messages are difficult to reconcile.  The messages to Richardson described the upcoming trip as "indefinite[]" in duration.  This is not how a person would be expected to describe a permanent move and is consistent with idea that Mother and the Children would be

returning to France on an as-yet-determined future date (perhaps in two months, as Mother had suggested in her statement to the police).

The statements to Lodge are not qualified in the same manner.  Statements such as "I'm actually moving back to the USA" and "I'll be moving back with my kids June 30" suggest that Mother viewed the June 30, 2022 trip to be part of a permanent move, not an "indefinite" trip from which they'd be returning.  Thus, the messages to Lodge provide support for Mother's position.

With that said, it must be noted that Mother's statements about her own intent are not necessarily indicative of whether Father was aware of and consented to that intent. There is no evidence that Father saw or was otherwise made aware of the content of Mother's June 22, 2022 text message to Lodge before he authorized Mother and the Children to leave for the United States on June 30, 2022.  Thus, even though the text message to Lodge may, when viewed in isolation, support Mother's position, it is not dispositive.

L.    **Mother's June 29, 2022 Text Messages**

On June 29, 2022, Mother exchanged a series of text messages with Catherine Peyré ("Catherine"), who is Father's aunt.  (Ex. 56, Bates 174.)  The exchange began with Catherine saying that she "loved [Mother] very much" and "the whole family . . . regret[s] this decision very much."  (*Id.*)  In response, Mother wrote (among other things) that "It's not me who decided that it's not my decision, it's Charles'.  I am very confused, and I do not know what will happen in the future."  (*Id.*)  Catherine replied: "If you haven't had any feedback, it is because no one knows!  You haven't told anyone, and everyone thinks you are going to go home like you did last summer.  I want to trust you to find a solution for you and the children and the Garage."  (*Id.*)  Later, Catherine added: "I don't understand why Charles would have done that.  Everything is so confusing so everything will be OK over time."  (*Id.*)

From the Court's perspective in its capacity as factfinder, this is another example of a text-message exchange that is somewhat helpful to Mother, but too ambiguous to be

1    dispositive.  Although the statements in this exchange could be viewed as consistent with

2    the idea that Mother's upcoming trip with the Children was part of a permanent move to

3    the United States to which Father consented, the statements are also susceptible to other

4    interpretations.  For example, the reference to "this decision" might be a reference to a

5    permanent relocation to the United States on June 30, 2022, but it might also be a reference

6    to the parties' decision to divorce, after which Mother would leave the country for good

7    (with the Children likely being allowed to come with her).  Similarly, the statement

8    "everyone thinks you are going home like you did last summer" might be a reference to

9    the fact that Father knew this trip was a relocation (and not a summer vacation), which

10   would support Mother's position on the issue of consent, but might also be a suggestion

11   that everyone in Father's family, including Father, was unaware of Mother's intention not

12   to return (which would support Father's position on the issue of consent).

13        **M.**     **Father's June 29, 2022 Statement To The Children**

14        On June 29, 2022, Father, Mother, the Children, and Mother's sister were all present

15   at the parties' apartment in France, preparing for the following day's flight.  According to

16   a declaration provided by Mother's sister, Father "played with the Children throughout the

17   day.  At one point, I overheard him tell them that he loved them, that he would not see them

18   for a long time but would visit them when he could."  (Ex. 52, Bates 158.)  Meanwhile,

19   during his testimony during the evidentiary hearing, Father questioned whether Mother's

20   sister would have understood the words he spoke to the Children during this conversation

21   (because he was speaking in French) but acknowledged that the conversation involved a

22   tearful goodbye: "They were going away for two months, I obviously say good-bye to my

23   kids. . . .  I mean, I cry all the time when I see them . . . .  So two months you can imagine."

24   (Tr. 379.)

25        From the Court's perspective in its capacity as factfinder, Father's conduct and

26   statements during his interactions with the Children on June 29, 2022 shed little light on

27   the issue of consent.  Irrespective of whether the trip on June 30, 2022 was a permanent

28   relocation to the United States or the start of a two-month vacation to the United States, it

would be normal and expected for Father to be tearful and say goodbye to the Children the day before their departure.

### N.   Father's June 30, 2022 Travel Authorization

On June 30, 2022, Mother, Mother's sister, and the Children left the parties' apartment in France to head to the airport.  Father helped drive them to the train station.  In anticipation of the trip, Mother asked Father to hand-write a travel authorization and Father agreed to do so.  It is dated June 30, 2022 and provides as follows: "I authorize my wife Katie McGarey-Peyre to leave the territory with our kids."  (Ex. 43.)

From the Court's perspective in its capacity as factfinder, this authorization document is too ambiguous to shed much light on the issue of consent.  Mother requested the document because she believed the airline would require it before allowing her to board an international flight with the Children outside Father's presence.[8]  Thus, the fact that Father signed the document is equally consistent with Mother's position (*i.e.*, the flight was part of a permanent relocation to the United States) and Father's position (*i.e.*, the flight was the start of a two-month international vacation).

Of course, in hindsight, and given Father's awareness of the warnings set forth in Madame Carmouse's letter—specifically, that it was risky to allow Mother to leave France with the Children—it would have been prudent for him to specify in the authorization document that he was not agreeing to a permanent relocation.  But his failure to do so is not, in the Court's estimation, proof of consent to a permanent relocation.  If, as Father contends, he was expecting Mother to follow through on the asserted plan to return to France with the Children at the end of the summer, it would have been highly provocative and antagonistic for him to hand-write into the authorization document that he was only granting a travel authorization on those terms.

…

---

[8]   Mother's sister wrote in a declaration: "Katie asked Charles to provide her with a handwritten letter stating that he consented to her leaving France with the Children as it may be required for us to board our flight from Paris to New York."  (Ex. 52, Bates 158.)  Likewise, Father testified: "You cannot travel with kids without the authorization of the other parent.  Doesn't mean that I let her like settle in another country."  (Tr. 464-65.)

III.     Logistical And Other Details Concerning The Trip

In an effort to show that the June 30, 2022 trip to the United States was a permanent relocation to which Father consented, Mother presented an array of evidence concerning the details of the trip.  Among other things, Mother presented evidence that she bought a large number of packing boxes and used them to ship the bulk of her French possessions to the United States (with Father helping to buy and pack the boxes); that she also sold or otherwise disposed of the Children's furniture and other possessions in France; that she and her family took steps in anticipation of the trip to register the Children for a highly sought-after preschool program in Arizona; and that she attended a going-away party right before the trip and otherwise received gifts from friends and neighbors that were consistent with those individuals saying a final goodbye.

Father attempted to counter this evidence by downplaying the volume of the materials shipped in the boxes; noting that Mother also left behind some of her and the Children's possessions; showing that the preschool program would not have started until long after June 2022 (and, thus, the mere fact of registration in May 2022 does not evince an intent to permanently relocate in June 2022); suggesting that the going-away parties and gifts were also consistent with how friends would react before a multi-month trip; and suggesting that the sale of the Children's cribs was simply because the Children were growing and would soon be ready for toddler beds.  Father also presented evidence that Mother failed to take certain steps, in the aftermath of the trip, that might be expected of a person who had permanently left a country, such as cancelling certain French benefit payments.

From the Court's perspective in its capacity as factfinder, the evidence regarding the shipping and other trip-related details is too ambiguous to support either side's position.  Those details are largely consistent with the notion that Mother and the Children were moving permanently to the United States in June 2022.  However, they are also consistent with the notion that, even though Mother hoped and planned to *eventually* relocate to the United States with the Children, she would be returning to France with the Children a few

- 18 -

months after the trip to sort out the details of her divorce from Father and the resulting custody arrangement.

IV.     Post-Departure Statements And Conduct

During the hearing, in an effort to address the issues of consent and acquiescence, both sides presented evidence regarding the parties' statements and conduct following the June 30, 2022 trip.

As an initial matter, it must be noted that, at the time Mother and the Children left on June 30, 2022, Father was facing criminal domestic violence charges related to the incident on June 20, 2022.  The trial on those charges was scheduled for October 2022, and Father testified during the evidentiary hearing that he was reluctant to engage in much communication with Mother until the charges were resolved out of fear that she might retaliate against him in a way that was harmful to his criminal defense.  Indeed, on October 6, 2022, soon after he was acquitted of the charges, Father sent the following text message to Mother: "Until Monday's judgment I was not free to talk to you.  Anything I said or did could have been used against me.  And I/you/we could have lost even more.  I want to apologize if I was cold or distant.  It was wanted [sic] and sometimes reluctantly but unfortunately essential."  (Ex. 35, Bates 21.)   The overhang of the criminal charges provides a possible explanation for Father's relative inaction in the months immediately following Mother's departure.

To that end, in late July 2022, Mother sent text messages to Father asking him to cancel the Children's French health insurance and informing him that she had a new American phone number.  (Ex. 35, Bates 18.)  The Court does not view these messages as providing much insight on the issues of consent or acquiescence.  Although they may reflect that Mother had no intention to return to France in the weeks following the trip, they do not show that Father was aware of that intention (and consented to it) before she left or that he was belatedly acquiescing to it.  Indeed, the relevant trial exhibit does not show that Father even responded to these text messages.

On August 2, 2022, the parties exchanged a series of text messages.  Mother began

the exchange by writing: "I have no idea how you feel about anything, or what will happen between us in the future.  Do you even consider the possibility of moving to the United States or is that something I should consider as not going to ever happen?" (Ex. 35, Bates 18.)  Father responded: "What I feel about things is that I'm very sad not to physically see my children anymore.  There is a great emptiness in my heart that I no longer have them on a daily basis.  I am considering the idea of moving to the US.  It's still in the thinking stage. . . .  Nothing concrete to date." (*Id.*)  Mother then wrote: "Do you ever think about us?  O[r] is it just the kids you miss in your life?" (*Id.*)  Father responded: "You have and will always count in my life for being my wife and for being the mother of our children. That said between us it's over.  We will never be a couple again." (*Id.*)  About an hour later, Mother wrote that "[w]ell you won't have to consider the idea of moving anymore because it's no longer a possibility," and when Father asked why, Mother stated that his visa eligibility hinged on remaining married to her: "You won't be with me, you don't have the visa." (*Id.*)

These text messages, again, shed little light on the issues of consent and acquiescence.  Nothing in them suggests that Father had agreed, before June 30, 2022, to allow Mother and the Children to make a permanent move to the United States on that date. Additionally, nothing in them suggests that Father had belatedly acquiesced to that state of affairs.  His discussion of possibly moving to the United States was tentative and not inconsistent with the position he took in various pre-trip communications and continues to take in this litigation—that is, that Mother and the Children should return to France so a French judge can resolve their divorce and make a custody determination.

In a related vein, on August 10, 2022, the parties exchanged another series of text messages, this time related to daycare, health insurance, and child support.  (Ex. 35, Bates 19-20.)  Father's first response to Mother's messages on these topics was to clarify that, "in my opinion, it is better to go through a lawyer given our situations (different nationalities, remoteness, separation of property)." (*Id.*)  Father also stated: "I keep the house in the hope of receiving the children one day.  The law is very strict on this subject

in France.  I must have a second room to accommodate them." (*Id.*)  These statements are inconsistent with any claim of consent and acquiescence—they show that, less than six weeks after the trip, Father was expressing his desire (which he also expressed in many of his pre-trip communications) to litigate the issue of child custody via lawyers, with the hope that he would be awarded custody of the Children by a French judge.

On November 23, 2022, Father went to a police station in his town in France to formally report that Mother had taken the Children without his permission.  (Ex. 5, Bates 170-77.)  During this visit, Father also accused Mother of engaging in domestic violence against him in the past.  (*Id.*)  Relevant to the allegation of wrongful removal, Father asserted that "[i]n June, she wanted to go on vacation in Phoenix, at her parents' house.  It was still not possible for me to leave my business, and I agreed then to let her leave with the little ones. . . .  [O]n the 23rd,[9] she had the police intervene at our home, mentioning some domestic violence.  I was picked up by the police. . . .  I had a hard time getting out of there, for they heaped accusations on me.  That's why, when she asked me for an authorization for the children to leave France, I agreed, thinking that it would calm things down between us. . . .  I could not imagine that she might not come back, even though she had threatened me with not coming back, I knew it." (*Id.*, Bates 172-73.)

During the evidentiary hearing, Mother placed heavy emphasis on the Father's use of the phrase "I knew it," suggesting it was proof of his consent or acquiescence.  The Court respectfully disagrees and views Father's statement to the French police as consistent with how he described his understanding of Mother's trip in his pre-trip communications and continues to describe it in this litigation—as a vacation to the United States that Mother later, and without his consent, converted to a permanent move.

V.    Domestic Violence/Grave Risk

One of Mother's defenses in this action is that "the return of the Children would expose them to a grave risk of harm based on Father's domestic violence against Mother

---

[9]    It appears this date was a mistake, as the incident involving police intervention occurred on June 20, 2022.

and serious abuse or neglect against the Children." (Doc. 15 at 5-6. *See also* Doc. 23 at 17-20.) This defense is based on the series of incidents described below.

First, in May 2018, after Father and Mother got into a verbal disagreement, Father smashed his head into a door in an apparent self-harm attempt. (Tr. 451.) As Father explained: "I wanted my life to stop at that moment and I smashed my head against the door so as not to wake up. No luck." (*Id. See also* Tr. 635 [Mother: "He tried to smash his head . . . in our bedroom door and broke a huge portion of the door out. . . . [T]hat's the night that he was tripping me outside the house."].)

Second, on April 7, 2022, Mother asked Father to look after the Children, who were on the bottom floor of the parties' apartment, while she was on the top floor. (Tr. 513-14.) Soon afterward, one of the Children fell and sustained a cut to his finger that required emergency treatment at the hospital. (*Id.*) According to Mother, the injury was caused by Father's decision to play a game on his phone rather than pay proper attention to the Children. (*Id.*)

Third, on a later date in April 2022, Mother, Father, and the Children were visiting Paris when Mother and Father got into an argument. (Tr. 517-18.) According to Mother, Father "literally abandoned us on the street of Paris . . . . [He] grabbed the sandwiches, chucked them in the trash and just left us in Paris. . . . I was like crying on the street and random people were helping me. I was so overwhelmed." (*Id.*)

Fourth, on May 27, 2022, Father and Mother got into the disagreement that is discussed in more detail above. According to Mother, Father "got really upset," puffed up his chest and belly, and then "body slammed" her in a manner that caused her to trip but not fall to the ground. (Tr. 525-26.)[10] Father sought to characterize this encounter in a more benign light, testifying that although he and Mother were "[b]elly against belly and we pushed each other . . . it stopped there. There has been no actual real violence, like we

---

[10] Similarly, during her interview with the police on June 20, 2022, Mother described the May 27, 2022 incident as follows: "[We] started an argument and he came towards me in the kitchen and with his body, his belly he was pushing me with his torso with his belly to push me and make me fall . . . . I slightly lost my balance. . . . I wasn't hurt." (Ex. 5, Bates 146.)

didn't punch each other, push each other, nothing."  (Tr. 505.)[11]  Mother disagreed with Father's characterization: "He didn't push me in the stomach.  He body slammed me." (Tr. 638.)

Fifth, on June 20, 2022, Father and Mother got into the disagreement that is discussed in more detail above.  According to Mother, Father "turned into like a raging animal," "charged" toward her as she was holding Madame Carmouse's letter, and "with a ton of force . . . smacked [her] body against the cabinets. . . .  [He] hit me really hard against them and then he's pinning me with his body." (Tr. 536-37.)  Mother further testified that Father then "physically grabbed [her] hand . . . with a ton of force [and] tried to rip the letter out of [her] hand." (Tr. 537.)  According to Mother, she "scratched to push him away from [her] and . . . tugged the collar of his shirt and scratched his neck at the same motion to like get him off [her]." (*Id.*)  Mother then asked Father to leave the house, Father refused, and Mother called the police.  (Tr. 538-39.)[12]  Father provided a somewhat different account of this incident.  According to Father, he spent a half hour attempting to calm Mother down and then, when she refused to turn over Madame Carmouse's letter, he "approached her and tried to block her with [his] body like a basketball.  It's a police way of saying that [he] pushed her with [his] chest. . . .  At that moment she tried to tear [his] T-shirt and scratched [his] neck." (Tr. 439-40.)

Although these incidents do not paint Father in a flattering light—Father admitted, during his post-arrest interview following the June 20, 2022 incident, that his "reaction [was] clearly inappropriate" (Ex. 37, Bates 88)—Mother's statements and conduct in the aftermath of these incidents are inconsistent with the notion that she views Father as posing a grave risk of harm to herself or the Children.  For example, during her interview with the

---

[11]     Similarly, during his interview with the police on June 20, 2022, Father admitted that he pushed Mother with his stomach in a "violent" manner on May 27, 2022 but claimed he was simply attempting to look intimidating.  (Ex. 38, Bates 88-89.)

[12]     Similarly, during her interview with the police on the night of the June 20, 2022 incident, Mother described the incident as follows: "Charles came to me and pushed me, he wanted to take the letter in one hand and he pushed me with the other hand quite strongly on the countertop. . . .  My back hurt on the countertop . . . and my head banged on a cabinet . . . .  I suddenly reached, I [tore] the collar of his shirt for him to release me to make him go away and protect myself . . . ." (Ex. 5, Bates 144.)

French police on June 20, 2022, Mother stated that she did not feel "in danger" from Father, also did not think that Father posed a danger to the Children, and did not wish to press charges or file a complaint.  (Ex. 5, Bates 150, 152.)  During this interview, Mother also described Father as "a good father," at least when not distracted by his phone.  (*Id.*, Bates 150.)  These statements are consistent with Mother's conduct in the immediate aftermath of the incident.  Soon after Father was released from police custody, Mother invited him to accompany her to a visit to a "naturist" (*i.e.*, nudist) retreat in France, which he declined.  (Tr. 559-60.)

Separately, on September 6, 2022, Mother sent a text message to Father in which she invited him to come to the United States and stay at her parents' house in Arizona (where she was also living with the Children) while her parents were on vacation: "Hey so my parents are going on vacation the week of October 20-26.  Just throwing this out as an option for when you could visit and stay at the house if you would like."  (Ex. 35, Bates 20.)  Similarly, on October 6, 2022, Mother made another offer for Father to stay with her and the Children, this time for purposes of an anticipated trip over the holidays: "If [I] have a home by then you can stay with us, if not, we can all stay at [the] Kaisers over the holidays because they will be traveling."  (Ex. 35, Bates 21.)  Finally, on October 29, 2022, Mother made another offer for Father to stay with her and the Children when he was visiting over the holidays: "I was thinking of renting a cabin near the Grand Canyon for a few days.  2-3 bedrooms so we can each have a room.  Does that interest you?  Somewhere with a little cowboy town to hang out in and close to the Grand Canyon to go see it one day. . . .  I found a cute Airbnb in Prescott, Arizona that is 1/2 mile from the historic downtown.  I was thinking [of] staying 12/29-1/2."  (Ex. 1, Bates 14-15.)

VI.   <u>Acclimatization</u>

Another of Mother's defenses in this action is that the Children have become acclimated to living in the United States, such that ordering their return to France would be impermissible.  (Doc. 23 at 6-9.)  In support of this defense, Mother testified that the Children have been attending the same daycare facility for nine months and are

1  "[c]ompletely adapted" to it, have established new relationships with pediatricians in
2  Arizona, have made new "best friends," and have formed close relationships with Mother's
3  parents and extended family.  (Tr. 640-50.)

4  **CONCLUSIONS OF LAW**

5  I.    Father's Prima Facie Case

6          "A court that receives a petition under the Hague Convention may not resolve the
7  questions of who, as between the parents, is best suited to have custody of the child."
8  *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010).  Instead, the court must begin its
9  analysis by determining whether "the child has been wrongfully removed or retained within
10 the meaning of the Convention."   22 U.S.C. § 9003(e)(1)(A).   The petitioner—here,
11 Father—bears the burden of proof on this issue and must prove it by a preponderance of
12 the evidence.  *Id.   See generally Colchester v. Lazaro*, 16 F.4th 712, 717 (9th Cir. 2021)
13 ("The Hague Convention is a multilateral international treaty on parental kidnapping that
14 seeks to deter parental abductions.  The objects of the Convention are to secure the prompt
15 return of children wrongfully removed or retained in any Contracting State and to ensure
16 that parents cannot gain tactical advantages in child custody proceedings by absconding
17 with a child to a more favorable forum or by otherwise undermining custody decrees
18 entered in the country of the child's habitual residence.  The Convention's focus is thus
19 *whether* a child should be returned to a country for custody proceedings and not *what* the
20 outcome of those proceedings should be.") (cleaned up).

21         To determine whether the removal or retention was "wrongful," a district court must
22 answer a series of four questions:

23         (1) When did the removal or retention at issue take place?  (2) Immediately
        prior to the removal or retention, in which state was the child habitually
24      resident?   (3) Did the removal or retention breach the rights of custody
        attributed to the petitioner under the law of the habitual residence?  (4) Was
25      the petitioner exercising those rights at the time of the removal or retention?

26 *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001).

27         The dispute in this case largely focuses on the applicability of ICARA's exceptions
28 for consent, acquiescence, and/or grave risk, rather than on whether Father has established

- 25 -

a prima facie case of wrongful removal.  Nevertheless, in an abundance of caution, the Court clarifies that Father has, in fact, successfully established a prima facie case.

### A.    Date Of Removal

As for the first element—the date of removal—both sides agree in their pleadings that the relevant date is June 30, 2022.  (Doc. 1 ¶ 20; Doc. 15 ¶ 11.)  The evidence on this point during the evidentiary hearing was undisputed.

### B.    Habitual Residence

As for the second element—the country of habitual residence—the Court concludes that the Children were habitual residents of France immediately before their removal.

As an initial matter, Mother does not appear to dispute this point.  Although Mother asserted in her answer that she "denies that France is the habitual residence of the Children" (Doc. 15 ¶ 22), the Court asked Mother's counsel, at the outset of the evidentiary hearing, to clarify whether Mother is "making a habitual residence claim or . . . an acclimatization claim." (Tr. 9.)  In response, Mother's counsel stated: "[T]here's no dispute with regard to the children's residence up to the date that mother left, but it's more of an acclimatization issue with regard to since that time."  (*Id.*)  Similarly, just before the parties presented closing argument, the Court asked Mother's counsel to clarify "are you taking the position . . . that the children's habitual residence was the United States at the time of the move on June 30th or are you taking the position that Mr. Peyre consented to the move?"  (Tr. 759-60.)  Mother's counsel responded: "We're taking the position that Mr. Peyre consented to the move."  (*Id.*)  The Court interpreted these statements as a concession that the Children's habitual residence at the time of the removal was France.

Nevertheless, even assuming it is disputed, the question of habitual residence does not present a close call.  As the Supreme Court recently clarified, "[t]he place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Monasky v. Taglieri*, 140 S. Ct. 719, 726 (2020).  "Because locating a child's home is a fact-driven inquiry, courts must be sensitive to the unique circumstances of the case and informed by common sense."  *Id.* at 727 (citation and internal quotation marks omitted).

"There are no categorical requirements for establishing a child's habitual residence—least of all an actual-agreement requirement for infants. . . .  An infant's 'mere physical presence' . . . is not a dispositive indicator of an infant's habitual residence.  But a wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual.'"  *Id.* at 728-29.

Here, the Children were born in France to a French father and, at the time of their removal, had lived their entire lives (except for some vacations) in France.  It follows that the Children were habitual residents of France immediately before their removal on June 30, 2022.  *In re A.L.C.*, 607 F. App'x 658, 662 (9th Cir. 2015) ("The district court clearly erred in finding E.R.S.C. could be a habitual resident of a nation in which she never resided. . . .  [W]e recognize the obvious truth that 'habitual residence cannot be acquired without physical presence.'"); *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) ("Thomas was born in Germany to a German father and an American mother and lived exclusively in Germany except for a few short vacations before Mrs. Friedrich removed him to the United States.  Mrs. Friedrich argues that despite the fact that Thomas's ordinary residence was always in Germany, Thomas was actually a habitual resident of the United States because . . . Mrs. Friedrich intended to return to the United States with Thomas when she was discharged from the military.  Although these ties may be strong enough to establish legal residence in the United States, they do not establish habitual residence . . . [which] pertains to customary residence prior to the removal.").  *See generally Monasky*, 140 S. Ct. at 727 ("Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence.").

This conclusion is not undermined by the fact that Mother and Father had been discussing, in the months leading up to June 30, 2022, the possibility of jointly moving to the United States with the Children.  First, although the "shared, settled intent" of the parents was once a critical component of the habitual-residence analysis under Ninth

Circuit law, the factor has less salience in light of the Supreme Court's 2020 decision in *Monasky*. *See, e.g.*, *Farr v. Kendrick*, 824 F. App'x 480, 481 (9th Cir. 2020) ("The district court thoroughly and carefully reviewed the evidence and found that the parents did not have a shared, settled intent to abandon the United States as their habitual residence when they moved to Mexico, pursuant to existing precedent.  However, after the district court's decision, the Supreme Court [in *Monasky*] held that a child's habitual residence depends on the totality of the circumstances specific to the case.  Thus, a wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being habitual.") (citations and internal quotation marks omitted); *Rosansen v. Rosansen*, 2023 WL 128617, *1 (9th Cir. 2023) ("The district court did not clearly err in finding that Norway was the habitual residence of the parties' children.  Any agreement between the parents to raise the children in the United States was not dispositive.") (citation omitted).[13]  Second, at any rate, Mother and Father had not yet developed, by June 30, 2022, a shared, settled intent to raise the Children in the United States—as discussed in other portions of this order, the plan was ever-changing and subject to various unfulfilled contingencies.

Finally, to the extent the concept of acclimatization is applicable here, it does not change the habitual-residence analysis.  *Murphy v. Sloan*, 764 F.3d 1144, 1152-53 (9th Cir. 2014) (noting that "courts should be slow to infer [acclimatization], both because the inquiry is fraught with difficulty, and because readily inferring abandonment would circumvent the purposes of the Convention") (citation and internal quotation marks omitted).  Although the Court appreciates and accepts that the Children have made good friends and become close to Mother's family since their removal to the United States in June 2022, the bottom line is that they are two-year-olds who have lived most of their lives in France.  They have not become so acclimatized to living in the United States as to alter

---

[13]    In the portion of the joint trial brief discussing the concept of habitual residence (Doc. 23 at 4-9), both parties cite cases decided before *Monasky*.

their habitual residence.  *Cf. Monasky*, 140 S. Ct. at 727 (suggesting that "older children [are] capable of acclimating to their surroundings" but other children may be "too young . . . to acclimate"); *Holder v. Holder*, 392 F.3d 1009, 1020-21 (9th Cir. 2004) ("The younger son's youth adds a twist to the analysis.  When and how does a newborn child acquire a habitual residence? . . . [I]t is practically impossible for a newborn child, who is entirely dependent on its parents, to acclimatize independent of the immediate home environment of the parents.").

### C.   Law Of The Country Of Habitual Residence

As for the third element—whether the removal breached the rights of custody attributed to Father under the law of France—Father alleges in his complaint that if the removal was wrongful, it was in violation of French law.  (Doc. 1 ¶ 22(a).)  In her answer, Mother does not dispute Father's allegations on this point.  (Doc. 15 ¶ 22 [only denying paragraph 22 to the extent it alleged that France was the habitual residence of the Children].)  Moreover, during the evidentiary hearing, Father introduced evidence that, under French law, "[t]he father and mother shall exercise parental authority in common" (Ex. 16, Bates 299), whereas Mother never raised any arguments or defenses concerning the third element of Father's prima facie case.  Similarly, this element is not identified as a disputed issue in the parties' joint trial brief.  (Doc. 23.)  Accordingly, the Court concludes that the removal did, in fact, breach Father's rights of custody under French law.

### D.   Actual Exercise Of Rights

As for the fourth element—whether Father was exercising those rights at the time of the removal—Mother admits in her answer that this element is satisfied.  (Doc. 15 ¶ 11 ["Mother admits the allegations . . . that Father continued to exercise parental rights and his relationship with the Children . . . ."].)  At any rate, the evidence bearing on this element was undisputed and showed that Father was, in fact, exercising his parental rights at the time of removal.  *See, e.g.*, *Asvesta v. Petroutsas*, 580 F.3d 1000, 1018 (9th Cir. 2009) (emphasizing that an ICARA petitioner has only a "minimal" burden when it comes to establishing the exercise of custodial rights, that such exercise may be established through

proof of "regular contact" with family members, and that "requiring a petitioning party to meet a high bar in demonstrating the actual exercise of custody rights [would] contradict[] the Convention's objective to reserve custody determinations for the country of habitual residence") (citations omitted); *Walker v. Walker*, 701 F.3d 1110, 1121 (7th Cir. 2012) ("The standard for finding that a parent was exercising his custody rights is a liberal one, and courts will generally find exercise whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.  Indeed, a person cannot fail to exercise his custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.") (cleaned up).

II.   Exceptions

Because Father has established a prima facie case of wrongful removal, the burden shifts to Mother to prove that an exception applies.

A.   **Consent And Acquiescence**

The first, related set of exceptions raised by Mother are those of consent and acquiescence, which are recognized in Article 13(a) of the Hague Convention.[14]  The parties agree (Doc. 23 at 9, 13) that Mother bears the burden of proving the applicability of these exceptions by a preponderance of the evidence.  *See also Gonzalez-Caballero v. Mena*, 251 F.3d 789, 793 (9th Cir. 2001); 22 U.S.C. § 9003(e)(2)(B).

As an initial matter, it is important to note that "ex ante consent" and "ex post acquiescence" are analytically distinct concepts.  *Gonzalez-Caballero*, 251 F.3d at 794.  "Under the Hague Convention's plain, unambiguous language, consent before the removal and retention *or* subsequent acquiescence extinguishes the right of return."  *Id.*  Thus, if a respondent establishes "ex ante consent," the court's "inquiry [is] complete because even ex post non-acquiescence could not revive [a] right of return under the Convention."  *Id.*

---

[14]   Specifically, Article 13(a) provides that, "[n]otwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that . . . the person, institution or other body having the care of the person of the child . . . had consented to or subsequently acquiesced in the removal or retention."

1    With that said, "conduct after removal can be useful in determining whether consent was

2    present at the time of the removal." *Id.  See also Baxter v. Baxter*, 423 F.3d 363, 371 (3d

3    Cir. 2005) ("Although analytically distinct, the defenses of consent and acquiescence under

4    article 13(a) of the Hague Convention are both narrow.  The consent defense involves the

5    petitioner's conduct prior to the contested removal or retention, while acquiescence

6    addresses whether the petitioner subsequently agreed to or accepted the removal or

7    retention.") (citations omitted).

8        With those clarifications in mind, the Court first addresses consent.  To succeed on

9    this defense, Mother must establish that Father "actually, subjectively intended to allow

10   [the Children] to remain in the United States." *Berenguela-Alvarado v. Castanos*, 950 F.3d

11   1352, 1360 (11th Cir. 2020).  Critically, "[e]ven ambiguous statements or actions don't

12   suffice; the Convention requires the parent opposing removal to unequivocally demonstrate

13   that the petitioning parent consented to the child's indefinite stay in America." *Cuellar*,

14   596 F.3d at 512 (cleaned up).  Such "consent needn't be formal, but it is important to

15   consider what [Father] actually contemplated and agreed to in allowing the [Children] to

16   travel outside [their] home country.  The focus . . . should be on [Father's] subjective intent,

17   and should take into account the nature and scope of [his] consent, and any conditions or

18   limitations on that consent." *Berenguela-Alvarado*, 905 F.3d at 1359 (cleaned up).  Thus,

19   "[t]he fact that a petitioner initially allows children to travel, and knows their location and

20   how to contact them, does not necessarily constitute consent to removal or retention under

21   the Convention." *Baxter*, 423 F.3d at 371.  Indeed, "[m]any cases begin with a parent's

22   taking the child away from home for a vacation or visit with the consent of the other parent,

23   but nevertheless result in a Hague Convention order compelling the child's return." *Fabri

24   v. Pritikin-Fabri*, 221 F. Supp. 2d 859, 871-72 (N.D. Ill. 2001)

25       Here, for the reasons discussed in more detail in the Findings of Fact, Mother has

26   failed to meet her burden of establishing that Father's actual, subjective intent when

27   authorizing the Children to leave France with Mother on June 30, 2022 was to allow them

28   to begin living permanently in the United States from that point forward.  Although many

of the pieces of evidence bearing on this point are frustratingly ambiguous, and some could individually be viewed as supporting Mother's position, the Court cannot ignore the fact that, during the roughly month-long period preceding the departure date, both Father and Mother repeatedly referred to the trip as some variant of a temporary visit to the United States from which Mother and the Children would be returning. For example, when speaking to the police on June 20, 2022, Mother stated that she had argued with Father a few weeks earlier about the "date he wanted to come to the USA, to check about our return to France" and characterized her upcoming trip as "go[ing] to the United States for 02 months." (Ex. 5, Bates 144, 146.) Similarly, in text messages sent to a friend in the weeks leading up to the trip, Mother discussed her plan to "go ahead to Arizona . . . to set up life" *after* the expiration of her work permit in January 2023 (Ex. 34, Bates 10), her plan to "move to Arizona before Xmas so we can be there for the holidays" (*id.*, Bates 12), and her plan to "leav[e] France indefinitely June 30" (*id.*, Bates 13). Meanwhile, although some of Father's communications during this period (like his May 27, 2022 email and his statement to the police on June 21, 2022) acknowledged that Mother and the Children might ultimately wind up living in the United States without him, these communications also suggested that various other developments would need to occur first.

The Court does not discount the possibility that Mother may have honestly, if incorrectly, believed that her trip on June 30, 2022 was a permanent move being made with Father's blessing. The trip occurred during a particularly tumultuous time in the parties' marriage, during which their communications were strained. But to the extent there was some miscommunication or misunderstanding, it is only Father's subjective intent that matters for purposes of Mother's consent defense. *Berenguela-Alvarado*, 950 F.3d at 1360. Additionally, "ambiguous statements or actions don't suffice" when it comes to consent. *Cuellar*, 596 F.3d at 512. Thus, although the issue presents a close call, the Court concludes that Mother has failed to establish that Father provided consent for her to move to the United States with the Children on June 30, 2022.

Nor has Mother met her burden of establishing acquiescence. On August 10,

2022—less than six weeks after the trip—Father sent text messages to Mother in which he expressed his desire to litigate the issue of child custody via lawyers, with the hope that he would be awarded custody of the Children by a French judge and the Children would live with him in France.  (Ex. 35, Bates 19-20.)  A few months later, after being acquitted of the criminal charges arising from the June 20, 2022 incident, Father filed a report with the French police accusing Mother of taking the Children without his permission and then filed formal return petitions under the Hague Convention.  Such conduct is inconsistent with the notion that Father acquiesced to the removal of the Children.  *Friedrich*, 78 F.3d at 1070 ("Subsequent acquiescence requires more than an isolated statement to a third-party.  Each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights. . . .  [W]e believe that acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time.").

### B.   **Grave Risk**

The final exception raised by Mother is the so-called "grave risk" exception, which is set forth in Article 13(b) of the Hague Convention.[15]  *See generally Golan v. Saada*, 142 S. Ct. 1880, 1887 (2022) ("[I]f a court finds that a child was wrongfully removed from the child's country of habitual residence, the court ordinarily must order the child's return.  There are, however, exceptions to that rule.  As relevant here, a court is not bound to order a child's return if it finds that return would put the child at a grave risk of physical or psychological harm.").  Mother bears the burden of proving the applicability of this exception by clear and convincing evidence.  22 U.S.C. § 9003(e)(2)(A).

The Ninth Circuit has emphasized that the grave-risk exception must be "drawn very

---

[15]   Specifically, Article 13(b) provides that, "[n]otwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."

narrowly" and "is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Gaudin v. Remis*, 415 F.3d 1028, 1035-36 (9th Cir. 2005) (citations and internal quotation marks omitted). "Rather, the question is whether the child would suffer 'serious abuse' that is 'a great deal more than minimal." *Id.* at 1035 (citations omitted). Additionally, "because the Hague Convention provides only a provisional, short-term remedy in order to permit long-term custody proceedings to take place in the home jurisdiction, the grave-risk inquiry should be concerned only with the degree of harm that could occur in the immediate future." *Id.* at 1037. Thus, "even a living situation capable of causing grave psychological harm over the full course of a child's development is not necessarily likely to do so in the period necessary to obtain a custody determination." *Id.*

Mother has not come close to establishing that the Children would be exposed to a grave risk of physical or psychological harm if returned to France. There is no suggestion that Father has ever abused or intentionally harmed the Children. To the contrary, the evidence presented during the evidentiary hearing suggests that Father was (and is) an involved, loving, and active parent. Mother herself described Father as "a good father" during her interview with the French police. (Ex. 5, Bates 150.) As for the incident in which one of the Children fell and sustained a finger injury, it is surprising that Mother would hold this out as evidence supporting a grave-risk claim. In hindsight, of course, Father should not have allowed himself to be distracted by his phone, but the incident involved an accidental fall by a toddler inside the parties' home while Father was in close physical proximity. This is a far cry from the sort of conduct that has been found to trigger the grave-risk exception. *Cf. Cuellar*, 596 F.3d at 510 ("[T]he district court concluded that Leyda was so neglectful that to return K.C. to her custody would be 'unsafe.' By drawing this conclusion about Leyda's fitness as a parent, the district court overstepped its mandate and impermissibly addressed the ultimate question of custody. Well-cared-for children do occasionally have accidents . . . . Richard's feeble showing . . . falls far short of clear and convincing evidence of 'serious abuse' that is 'a great deal more than minimal.'").

- 34 -

Mother also contends that she would be exposed to a grave risk of harm if forced to return to France with the Children.  As a legal matter, this theory is potentially viable. *Abbott v. Abbott*, 560 U.S. 1, 22 (2010) ("If . . . Ms. Abbott could demonstrate that returning to Chile would put her own safety at grave risk, the court could consider whether this is sufficient to show that the child too would suffer 'psychological harm' or be placed 'in an intolerable situation.'"); *Colchester*, 16 F.4th at 718 ("Spousal violence may also establish a grave risk of harm to the child, particularly when it occurs in the presence of the child.") (citation and internal quotation marks omitted).  But as a factual matter, it is unavailing. Without in any way excusing Father's conduct during the incidents described in the Findings of Fact, there is no evidence that Father ever punched or kicked Mother or caused her to sustain any injuries requiring medical attention.  Bumping up against one's spouse a few times in an aggressive manner, while improper, is not the sort of conduct that could support a grave-risk claim.  *Compare Walsh v. Walsh*, 221 F.3d 204, 218-20 (1st Cir. 2000) (emphasizing that "the harm must be a great deal more than minimal" and finding that the grave-risk exception was satisfied where the father had "demonstrated an uncontrollably violent temper," "his assaults have been bloody and severe," and there was "a clear and long history of spousal abuse, and of fights with and threats against persons other than his wife").  Additionally, and more important, Mother's conduct in the aftermath of these incidents—including telling the French police that she did not view Father as a danger to her, inviting Father to attend a retreat with her, then repeatedly inviting Father to stay alone with her and the Children during his visit to the United States—is very difficult to reconcile with the notion that she somehow views Father as posing a grave risk of harm to her.

III.    Attorneys' Fees And Costs

In the complaint, Father asserts that he "has incurred attorneys' fees and costs as a result of the wrongful retention of the Children by [Mother]" and "respectfully requests that this Court award him all costs and fees, including transportation costs, incurred to date as required by [statute]."  (Doc. 1 ¶¶ 28-29.)  In her answer, Mother generally denies these allegations.  (Doc. 15 ¶¶ 28-29.)  The parties did not further address the topic of attorneys'

fees and costs in their joint trial brief (Doc. 23) or during the evidentiary hearing.

Father's request is governed by 22 U.S.C. § 9007(b)(3), which provides:

> Any court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

*Id.* As the First Circuit has explained, although this formulation creates a "duty . . . to order the payment of necessary expenses and legal fees," this duty is "subject to a broad caveat denoted by the words, 'clearly inappropriate,'" and thus "giv[es] the district court broad discretion." *Whallon v. Lynn*, 356 F.3d 138, 140 (1st Cir. 2004). *See also Oztalin v. Oztalin*, 708 F.3d 355, 375 (2d Cir. 2013) ("[A] prevailing petitioner in a return action is presumptively entitled to necessary costs, subject to the application of equitable principles by the district court.").

Applying these standards, the Court concludes that Father is presumptively entitled to recover his attorneys' fees and costs because he has prevailed in this action and Mother has not, at least yet, attempted to identify any reason why an award would be inappropriate.

As for the amount of the award, LRCiv 54.2(b)(2) provides that "the party seeking an award of attorneys' fees and related non-taxable expenses must file and serve a motion for award of attorneys' fees and related non-taxable expenses (along with a supporting memorandum of points and authorities) within fourteen (14) days of the entry of judgment in the action with respect to which the services were rendered." Thus, within 14 days of entry of judgment, Father may file such a motion. Any response by Mother is due within 14 days of when Father's motion is filed. *See* LRCiv 54.2(b)(3). In that response, Mother may attempt to show why an award would be inappropriate. Any reply by Father is due within 7 days of when Mother's response is filed. The parties are also encouraged to meet and confer on the issue of attorneys' fees and costs in an effort to reach a negotiated resolution that avoids the need for further motion practice.

…

Accordingly, **IT IS ORDERED** that:

1.      Father's petition (Doc. 1) is **granted**.

2.      Mother shall return the Children to France within 30 days of this order.  Per 22 U.S.C. § 9007(b)(3), Mother shall be responsible for the transportation costs.

3.      The Clerk shall enter judgment accordingly and terminate this action.

4.      Father may, within 14 days of entry of judgment, file a motion for attorneys' fees and costs.  Any such motion shall be accompanied by an electronic Microsoft Excel spreadsheet, to be emailed to the Court's chambers email address, containing an itemized statement of legal services with all information required by Local Rule 54.2(e)(1). This spreadsheet shall be organized with rows and columns and shall automatically total the amount of fees requested to enable the Court to efficiently review and recompute, if needed, the total amount of any award after disallowing any individual billing entries. This spreadsheet does not relieve the moving party of its burden under LRCiv 54.2(d) to attach all necessary supporting documentation to its motion.

Dated this 30th day of May, 2023.

_____
Dominic W. Lanza
United States District Judge