**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Charles Olivier Peyre,<br><br>              Petitioner,<br><br>v.<br><br>Catharine Bliss McGarey,<br><br>              Respondent. | No. CV-23-00350-PHX-DWL<br><br>**ORDER** |

This is an action under the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*, brought by Petitioner Charles Olivier Peyré ("Father"), a French citizen, against Respondent Catharine Bliss McGarey ("Mother"), an American citizen. On May 30, 2023, following a five-day bench trial, the Court issued findings of fact and conclusions of law, concluding that Father is entitled to relief under ICARA and ordering Mother to return the parties' twin children ("the Children") to France. (Doc. 45.) The same day, the Clerk entered judgment in Father's favor. (Doc. 46.)

Now pending before the Court is Mother's motion for reconsideration. (Doc. 48.) More specifically, Mother seeks relief under Rules 52(b) and 59(e) of the Federal Rules of Civil Procedure. (*Id.*) Father opposes the motion and Mother has filed a reply. (Docs. 55, 57.) For the following reasons, Mother's motion is denied.

…

…

…

**DISCUSSION**

I.      Standard Of Review.

Mother seeks relief under Rules 52(b) and 59(e). The former is implicated because the challenge arises from the Court's issuance of findings of fact following a bench trial. Rule 52(b) provides that, "[o]n a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly." *Id.* Although the text of Rule 52(b) does not identify the standard for evaluating such a motion, the consensus is that "[p]arties should not use a Rule 52(b) motion to relitigate issues previously decided or introduce new theories, but rather to correct 'manifest legal or factual errors' or to present newly discovered evidence." 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 52, at 51 (2022). *See generally Nat. Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.*, 899 F.2d 119, 123 (1st Cir. 1990) ("Rule 52(b) is not intended to allow parties to rehash old arguments already considered and rejected by the trial court."); *Crane-McNab v. County of Merced*, 773 F. Supp. 2d 861, 873 (E.D. Cal. 2011) ("[T]he Rule is not intended to serve as a vehicle for a rehearing.").

Meanwhile, Rule 59(e) is implicated because the Court incorporated its findings and conclusions from the bench trial into a final judgment from which Mother seeks relief. Rule 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." *Id.* Similar to Rule 52(b), although the text of Rule 59(e) does not identify the standard for evaluating such a motion, "the view prevailing in the circuits is that motions to alter or amend the judgment are generally appropriate only in four situations: (1) to correct a manifest error of fact or law; (2) to incorporate newly discovered and previously unavailable evidence; (3) to prevent manifest injustice; and (4) to address an intervening change in controlling law." 2 Gensler, *supra*, Rule 59, at 250. *See generally Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011) (agreeing that these are the "four basic grounds upon which a Rule 59(e) motion may be granted"). The Ninth Circuit has elaborated that "amending a judgment after its entry

remains an extraordinary remedy which should be used sparingly" and that it is an "abuse[]" of Rule 59(e) to "raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Id.* at 1111-12 (cleaned up). Thus, Mother's requests for relief under Rules 52(b) and Rule 59(e) are functionally similar. *National Metal Finishing Co.*, 899 F.2d at 122 (noting "the close relationship between Rule 59(e) and Rule 52(b)" and characterizing the relief available under those rules as "so similar" that they are effectively interchangeable).

II. <u>Analysis</u>

A. **Habitual Residence**

In the "Conclusions of Law" section of the May 30, 2023 order, the Court began by addressing whether Father had met his burden of establishing a prima facie case for relief under ICARA. (Doc. 45 at 25-30.) Among other things, the Court was required to identify the date of removal or retention and then to determine the Children's state of habitual residence "[i]mmediately prior to the removal or retention." (*Id.* at 25, citing *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001).) The Court concluded that the date of removal was June 30, 2022—which, it is undisputed, is that date on which Mother and the Children flew to the United States from France—and that the Children were habitual residents of France immediately before their removal. (*Id.* at 26-29.)

In her motion for reconsideration, Mother argues that this analysis was flawed. (Doc. 48 at 3-4.) According to Mother, this case cannot be considered a wrongful removal case because she had Father's permission to travel to the United States with the Children on June 30, 2022. (*Id.*) Instead, Mother argues, this is at most "potentially . . . a wrongful retention case," that the retention could not have become wrongful until "either November 29, 2022, or January 2023," and that the Children had become habitual residents of the United States by either of those dates. (*Id.*) Father disagrees, arguing that Mother's arguments on this issue are waived, that the Court's analysis was correct, and alternatively that even "[i]f the Court is persuaded that it should analyze habitual residence as of an alternate date, then France is still the children's habitual residence." (Doc. 55 at 2-4.) In

reply, Mother argues that waiver principles are inapplicable because she "effectively answered and responded to Father's allegations in the Complaint and raised the issue of habitual residence at the time of wrongful removal or retention"; that any retention did not become wrongful "until November 29, 2022, [when] Father [first] asked when the children were going to come back to France," or until January 2023, when Father first "actually demand[ed] from Mother the return of the children to France" via the service of "the Hague papers"; and that "[w]hether one uses November 29, 2022, or January 2023, the children's habitual residence was in Arizona and the children had been in the U.S. since July 1, 2022." (Doc. 57 at 1-4.)

Mother's arguments on this topic do not undermine the Court's ultimate conclusion that Father is entitled to relief under ICARA. First, Mother forfeited these arguments by failing to raise them in a timely fashion. At no point in her answer (Doc. 15), during the status conference on March 27, 2023 (Doc. 16), in the parties' joint trial brief (Doc. 23), or during the five-day bench trial did Mother clearly articulate the argument she is now raising, which is that this is a wrongful retention case (rather than a wrongful removal case) and that the Children's habitual residence shifted from France to the United States at some point after the removal but before the retention became unlawful. To the contrary, Mother (and Mother's counsel) made a variety of statements that seemed to accept Father's framing of this case as a wrongful removal case in which the relevant date, for habitual-residence purposes, is the date of removal. For example, at the very outset of the bench trial, the Court asked Mother's counsel: "[I]sn't the law on habitual residence that it is gauged as of the date right before the departure?" (Doc. 38 at 9.) Mother's counsel responded: "Yes, sir." (*Id.*) That is not the answer one would expect from a party whose theory of defense—as now articulated in the motion for reconsideration—is that the country of habitual residence actually must be gauged as of a date that is months after the date of departure. The Court acknowledges that some of Mother's (and Mother's counsel's) other statements on this topic are just ambiguous enough that they can be construed as not flatly inconsistent with the position she is now taking, but that is a far cry from fairly presenting that position

1  before and during trial.  Accordingly, Mother may not raise that position now via a post-
2  trial motion under Rules 52(b) and 59(e).  *See, e.g.*, Gensler, *supra*, Rule 52, at 51 ("Parties
3  should not use a Rule 52(b) motion to . . . introduce new theories . . . ."); *Allstate Ins. Co.*,
4  634 F.3d at 1111-12 (it is an "abuse[]" of Rule 59(e) to "raise arguments or present
5  evidence for the first time when they could reasonably have been raised earlier in the
6  litigation") (citation omitted).

7         But even assuming that Mother's arguments on this topic are not forfeited, those
8  arguments do not change the conclusion that Father established a prima facie case for relief.
9  As an initial matter, although Mother asserts that "there can be no doubt this is not a
10  wrongful removal case but a wrongful retention case" (Doc. 57 at 3 n.1), the Court is not
11  so sure.  True, Father authorized Mother to take the Children to the United States on June
12  30, 2022, but that consent was conditioned on his belief that the trip was simply a summer
13  vacation from which Mother and the Children would be returning.  Because Mother did
14  not view the trip as a vacation and never intended to return, it is not clear why it would be
15  inaccurate to characterize the removal as wrongful from the outset.  As Father argues:
16  "Mother's leaving France with the children with the intention to permanently relocate the
17  children without Father's express knowledge or permission was a wrongful removal as of
18  June 30th."  (Doc. 55 at 3.)  In this respect, this case differs from *Baxter v. Baxter*, 423
19  F.3d 363 (3d Cir. 2005), which Mother cites for the proposition that "[g]iven Father's
20  consent . . . , this Court erred in treating this as a wrongful removal case and instead it must
21  be analyzed as a wrongful retention case."  (Doc. 57 at 4.)  There, "Mrs. Baxter did not
22  decide to stay in Delaware until she arrived there and met [a new boyfriend]. . . .  Mrs.
23  Baxter's decision represented a change in plan from what she and Mr. Baxter had agreed
24  upon before departing to Delaware."  423 F.3d at 372-73.  The Court does not construe
25  *Baxter* as foreclosing a claim of wrongful removal when, as here, the purported consent
26  was void from inception.

27         More important, even if this could be viewed as a wrongful retention case rather
28  than a wrongful removal case, Father would still prevail.  The Court rejects, in its capacity

as factfinder, Mother's proposed dates (either November 2022 or January 2023) for when the retention became wrongful. Father, at most, consented to Mother taking the Children to the United States for the summer. Thus, even assuming the initial removal was not wrongful within the meaning of ICARA, the retention became wrongful once the summer ended and Mother did not return with the Children. This would put the date of wrongful retention somewhere in the ballpark of August 2022 or September 2022. The Court has little trouble concluding, again in its capacity as factfinder, that the Children remained habitual residents of France as of that date—France remained the country where the Children were "at home." *Monasky v. Taglieri*, 140 S. Ct. 719, 726 (2020) ("The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence."). Spending a summer vacation in a different country does not come close to transforming a child into a habitual resident of that country. *See, e.g.*, *Mozes*, 239 F.3d at 1074 ("Even the child who goes off to summer camp arguably has a settled purpose to live there continuously for a limited period. [But n]o one would seriously contend that the summer camp is the child's habitual residence . . . .") (citations and internal quotation marks omitted); *Neergard-Colon v. Neergard*, 752 F.3d 526, 531 (1st Cir. 2014) ("The district court . . . merely found that the parents agreed that the children would be present in a particular place for a particular period of time that had yet to elapse. If that constituted a sufficient finding of intent to establish habitual residence, any parents consenting to a child spending an academic year abroad or even a summer vacation visiting relatives would risk changing their child's habitual residence.").[1]

Alternatively, even if one utilizes Mother's proposed dates, the Children remained habitual residents of France as of those later dates. In the May 30, 2023 order, the Court stated as follows:

> [T]o the extent the concept of acclimatization is applicable here, it does not change the habitual-residence analysis. *Murphy v. Sloan*, 764 F.3d 1144, 1152-53 (9th Cir. 2014) (noting that "courts should be slow to infer [acclimatization], both because the inquiry is fraught with difficulty, and

---

[1] The Court cites these pre-*Monasky* decisions with the understanding that *Monasky* supplies the relevant test for habitual residence.

- 6 -

>because readily inferring abandonment would circumvent the purposes of the Convention") (citation and internal quotation marks omitted).  Although the Court appreciates and accepts that the Children have made good friends and become close to Mother's family since their removal to the United States in June 2022, the bottom line is that they are two-year-olds who have lived most of their lives in France.  They have not become so acclimatized to living in the United States as to alter their habitual residence. *Cf. Monasky,* 140 S. Ct. at 727 (suggesting that "older children [are] capable of acclimating to their surroundings" but other children may be "too young . . . to acclimate"); *Holder v. Holder*, 392 F.3d 1009, 1020-21 (9th Cir. 2004) ("The younger son's youth adds a twist to the analysis.  When and how does a newborn child acquire a habitual residence? . . .  [I]t is practically impossible for a newborn child, who is entirely dependent on its parents, to acclimatize independent of the immediate home environment of the parents.").

(Doc. 45 at 28-29.)  Just as vacationing for a few months in the United States does not transform a child into a habitual resident of the United States, overstaying that vacation for a few more months (without one parent's consent) also does not have such a transformative effect. *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 612 (E.D. Va. 2012) ("[A] parent cannot create a new habitual residence by wrongfully retaining a child.  In cases where a child's initial translocation from an established habitual residence is clearly intended to be of a specific duration (such as a defined visit to see the father during summer vacation), courts have generally refused to find that the changed intentions of one parent can operate to alter the child's habitual residence.").  This is particularly true in the case of toddlers such as the Children, who were born in France, lived their entire lives in France up to the date of departure, and retained deep familial and other ties to France during their stay in the United States. *Cf. Darin v. Olivero-Huffman*, 746 F.3d 1, 20 (1st Cir. 2014) ("We recognize that the child has been living in Puerto Rico for three years now.  However, retaining the child in the United States against his father's wishes was a decision Olivero made on her own.  If we allow a parent to unilaterally change a child's habitual residence simply due to the passage of time, we would be encouraging the pursuit of this illegal route to custody.").[2]

---

[2] The Court also clarifies that the final two elements of the prima facie test would remain satisfied even if the wrongful retention date were deemed to be the end of summer

B. **Credibility Determinations**

The May 30, 2023 order includes a "Findings of Fact" section in which the Court attempted to analyze all of the evidence in this case and make credibility assessments as appropriate. (Doc. 45 at 2-25.) Among other things, the Court explained that it had "largely focused on the plans and intentions that the parties expressed in writing" and that although "both parties also sought to offer testimony and evidence about various purported oral admissions the other party made . . . [,] [t]he Court found that testimony and evidence less helpful than the written evidence, due to the lack of corroboration." (Doc. 45 at 3.) In a footnote, the Court elaborated:

> For example, one of Father's friends wrote in a declaration that Mother admitted to him during a conversation right before the June 30, 2022 flight "that she was home-sick (the USA)" and "never said that she wanted to stay and live in the USA" and "always stated that she was going for the summer break." (Ex. 21, Bates 354.) Meanwhile, Mother's father contends that Father admitted to him, during a vacation in London in April 2022, that Father knew Mother would be "moving to Phoenix with the kids" and confirmed that Father "would be OK to remain in France during the time it took to sell the bar . . . . [Father] compared this arrangement to a military family with a dad out on tour." (Ex. 50, Bates 151.) To be clear, the Court does not question [the] honesty of the witnesses who provided these (and similar) statements. However, it is difficult to make credibility judgments when presented with conflicting, uncorroborated statements by fact witnesses who are, understandably, sympathetic to their friend's or family member's legal position.

(*Id.* at 3 n.3.)

In her motion for reconsideration, Mother objects to this approach. (Doc. 48 at 4-6.) Mother argues that "a factfinder must judge the credibility of the witnesses and should not merely reject testimony which is uncontradicted or uncorroborated and certainly not just because it is difficult." (*Id.* at 5.) Mother also contends that "it is clear this Court focused just on the written statements and disregarded the testimony except when corroborated by contemporaneous writings." (*Id.* at 6.) Finally, Mother identifies various reasons why, if

---

2022, November 2022, or January 2023—such retention still breached Father's rights of custody under French law and Father was still exercising those rights.

- 8 -

the Court were to credit her or her father's testimony about various oral admissions that Father purportedly made to them, she would prevail (*id.* at 5-6) and identifies various reasons why the Court should have deemed Father's testimony incredible (*id.* at 5-6 n.3). In response, Father argues that the Court "fully and properly considered all evidence and appropriately made determinations regarding credibility on key evidence." (Doc. 55 at 4-9, capitalization omitted.) Father also contends that "[t]he consistency of the testimony from Mother's family that they always knew it was intended to be permanent can only lead to two alternate conclusions: either the family was lying to the Court in an attempt to ensure that Mother could keep the children in Arizona or they were being truthful and Mother was lying to Father for some period prior to May 24th until July 2022 when she announced on Facebook that she and the children were not returning to France. In either instance, the Court properly weighed the credibility factor against Mother and in favor of Father." (*Id.* at 8.) In reply, Mother reiterates her contention that "[t]he Court's decision for the most part fails to directly pick sides on particular issues which is what it is supposed to do as a factfinder, not simply evaluate documentary evidence." (Doc. 57 at 6.)

Mother is not entitled to relief based on these arguments. The Court did not categorically disregard any oral testimony that lacked corroboration. Instead, the Court simply clarified that, in general, it found such testimony "less helpful" than the written evidence. (Doc. 45 at 3.) It is surprising Mother would suggest this factfinding approach is improper. Although a factfinder may, of course, choose to believe a witness's testimony despite the absence of corroboration, a factfinder also may consider the presence or absence of corroborating evidence as one part of the credibility-assessment calculus. *See, e.g.*, *United States v. Yazzie*, 59 F.3d 807, 811 (9th Cir. 1995) ("The materials, which were found pursuant to a search warrant where the victim described them, corroborated the victim's descriptions of the abuse. For these reasons, the [materials] made the victim's accounting of the episodes of abuse more probable and the district court properly admitted them as relevant evidence."). This is a basic principle of credibility evaluation that the Court followed here.

Indeed, as discussed in extensive detail in the Findings of Fact, the Court carefully considered Mother's and Father's oral testimony, compared their oral testimony with the various written statements both of them made (as well as with other witness's testimony and other documentary evidence), and ultimately concluded that Father's account was more worthy of credence than Mother's in various important respects. To provide two examples, (1) the Court specifically noted that Mother's testimony during the evidentiary hearing in which she "flatly denied ever characterizing the June 30, 2022 trip as a 'vacation'" was contradicted by one of Mother's text messages, and thus had the effect of "undermin[ing] Mother's testimony on this point" (Doc. 45 at 12-13); and (2) the Court specifically noted that Mother's contention "that she views Father as posing a grave risk of harm to herself or the Children" was contradicted by an array of evidence and therefore not believable (*id.* at 23-24; *see also id.* at 35 ["Mother's conduct in the aftermath of these incidents—including telling the French police that she did not view Father as a danger to her, inviting Father to attend a retreat with her, then repeatedly inviting Father to stay alone with her and the Children during his visit to the United States—is very difficult to reconcile with the notion that she somehow views Father as posing a grave risk of harm to her."].) To the extent Mother's contention is that this discussion is flawed because it was not accompanied by a formal finding of credibility, the Court now clarifies that it did not find Mother's testimony to be credible in various important respects, which obviously played a key role in the outcome of this case. In contrast, the Court found Father's testimony to be credible in relation to the key disputed issues.

Finally, as for the statement in footnote three of the May 30, 2023 order that it was "difficult" to make credibility judgments in relation to some of the other witnesses in this case, such as Mother's and Father's family members and close friends, the Court was attempting to operate with a gentle touch in an emotionally charged case but now recognizes that the point could have been made with more clarity. To be clear, the Court did not accept, in its capacity as factfinder, the testimony from Mother's witnesses regarding Father's alleged admissions. First, as noted in footnote three, the bias and

- 10 -

partiality of those witnesses (and of the friend and family-member witnesses called by Father) raises inherent questions about their credibility. *See* 9th Cir. Model Jury Inst. 1.14 ("In considering the testimony of any witness, you may take into account . . . the witness's interest in the outcome of the case, if any . . . [and] the witness's bias or prejudice, if any."). Second, and more important, the Court did not evaluate their testimony in a vacuum but instead considered its believability within the context of all of the other evidence in the case, including the documentary evidence summarized at length in the findings of fact and the Court's credibility assessments of Mother and Father.

### C.     Consent And Acquiescence

The bulk of the May 30, 2023 order addressed Mother's affirmative defenses of consent and acquiescence. (Doc. 45 at 3-21, 30-33.) The Court clarified that "Mother bears the burden of proving the applicability of these exceptions by a preponderance of the evidence." (*Id.* at 30.) With respect to consent, the Court noted that, under Ninth Circuit law, "[e]ven ambiguous statements or actions don't suffice; the Convention requires the parent opposing removal to unequivocally demonstrate that the petitioning parent consented to the child's indefinite stay in America." (*Id.* at 31, citing *Cuellar v. Joyce*, 596 F.3d 505, 512 (9th Cir. 2010) (cleaned up).) Applying this standard, and acknowledging that "the issue presents a close call" and that "many of the pieces of evidence bearing on this point are frustratingly ambiguous, and some could individually be viewed as supporting Mother's position," the Court concluded that Mother had "failed to meet her burden of establishing that Father's actual, subjective intent when authorizing the Children to leave France with Mother on June 30, 2022 was to allow them to begin living permanently in the United States from that point forward." (*Id.* at 31-32.) Meanwhile, as for acquiescence, the Court noted that "[o]n August 10, 2022—less than six weeks after the trip—Father sent text messages to Mother in which he expressed his desire to litigate the issue of child custody via lawyers, with the hope that he would be awarded custody of the Children by a French judge and the Children would live with him in France. A few months later, . . . Father filed a report with the French police accusing Mother of taking the

Children without his permission and then filed formal return petitions under the Hague Convention. Such conduct is inconsistent with the notion that Father acquiesced to the removal of the Children." (*Id.* at 32-33.)

In her motion for reconsideration, Mother argues that both of these conclusions were manifestly erroneous. (Doc. 48 at 6-10.) In a nutshell, Mother accuses the Court of improperly "looking for a smoking gun or certainty in a writing regarding whether the June 30 departure was just for a vacation or a permanent move" and disagrees with how the Court construed some of the evidence. (*Id.*) In a related vein, Mother contends that "the Court held Mother to a higher standard than a preponderance of the evidence" and "was looking for certainty, something akin to a clear and convincing standard." (*Id.* at 10.) Finally, Mother provides a detailed chronology in an attempt to show why she should have prevailed on her consent and acquiescence defenses. (*Id.* at 10-13.) In response, Father defends the Court's analysis and argues that "a reasonable person could not conclude that Mother was held to a standard other than preponderance of the evidence." (Doc. 55 at 9-13.) In reply, Mother largely reiterates the arguments raised in her motion. (Doc. 57 at 7-9.) She concludes: "Mother recognizes and appreciates the effort this Court made, but she believes that this Court was searching for certainty rather than a mere preponderance of the evidence on the defenses of consent and acquiescence. Viewed individually, any particular testimony, evidence or fact could be viewed as not dispositive, but the weight of the evidence supported that it was more likely than not that Father consented in April, May and June 2022 to Mother and the children moving to the U.S. permanently and Father would follow when the bar was sold . . . ." (*Id.* at 9.)

Mother has not established any error, manifest or otherwise, in the consent and acquiescence analysis. The Court applied the correct burden of proof, which is preponderance of the evidence. The Court specifically noted that it was applying this standard. (Doc. 45 at 30.)[3] Any suggestion that the Court was secretly applying a different

---

[3] The Court also clarified, in different portions of the order, when it was applying a different burden of proof. (Doc. 45 at 33 [noting that Mother bore the burden of proving the grave-risk exception by clear and convincing evidence].)

- 12 -

and higher standard is inaccurate. Nor did the Court improperly require Mother to produce "a smoking gun" or rule against her for failing to do so. Instead, the Court simply followed Ninth Circuit law, which provides that "ambiguous statements or actions don't suffice" when it comes to consent. *Cuellar,* 596 F.3d at 512. Finally, to the extent Mother seeks to use her motion to relitigate the merits of her consent and acquiescence defenses, the Court declines to do so. Much thought and effort went into the May 30, 2023 order and the Court stands by the conclusions reached in it. *See, e.g.*, *Nat. Metal Finishing Co.,* 899 F.2d at 123 ("Rule 52(b) is not intended to allow parties to rehash old arguments already considered and rejected by the trial court."); *Crane-McNab*, 773 F. Supp. 2d at 876 ("The court is satisfied that the decision as written is the appropriate expression of its reasoning. The court gave much thought to its opinion . . . .").

Accordingly,

**IT IS ORDERED** that:

1. Mother's motion for reconsideration (Doc. 48) is **denied**.

2. The emergency stay (Doc. 54) is **lifted**.

3. Mother shall return the Children to France within seven days of this order. Per 22 U.S.C. § 9007(b)(3), Mother shall be responsible for the transportation costs.

Dated this 5th day of July, 2023.

Dominic W. Lanza
United States District Judge